UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MISC 06 036

FILED
U.S. DISTRICT COURT
2006 MAR 27 P 1:32
S.D. OF N.Y. W.P.

| | |
|---|---|
| THE UNOFFICIAL ON-SHORE CREDITORS' COMMITTEE OF THE BAYOU FAMILY OF COMPANIES,<br><br>Plaintiff,<br><br>v.<br><br>BAYOU GROUP, LLC, a Connecticut Limited Liability Company, BAYOU MANAGEMENT, LLC, a New York Limited Liability Company, BAYOU SECURITIES, LLC, a New York Limited Liability Company, BAYOU ADVISORS, LLC, a Delaware Limited Liability Company, BAYOU EQUITIES, LLC, a Delaware Limited Liability Company, BAYOU FUND, LLC, a New York Limited Liability Company, BAYOU SUPERFUND, LLC, a Delaware Limited Liability Company, BAYOU NO LEVERAGE FUND, LLC, a Delaware Limited Liability Company, BAYOU AFFILIATES FUND, LLC, a Delaware Limited Liability Company, BAYOU ACCREDITED FUND, LLC, a Delaware Limited Liability Company, SAMUEL ISRAEL, III, and DANIEL MARINO,<br><br>Defendants. | 06-cv-<br><br>06 CIV. 2379 |

## COMPLAINT

Plaintiff, The Unofficial On-Shore Creditors' Committee of the Bayou Family of Companies (the "Committee"), states as follows:

## I. INTRODUCTION

1. Defendants, through their management entity, Bayou Management, LLC (collectively, "Bayou"), operated a family of fraudulent hedge funds (the "Bayou Funds") from approximately 1997 through 2005.

2. The Committee is composed of investors of Bayou who deposited funds with one

or more of the Defendants with a contractual right to redeem their investments on demand (the "Creditors"). The Defendants announced the liquidation of the Bayou Funds in July 2005, but to date no funds have been returned to Creditors.

3. The Committee is informed and on that basis believes that Defendants originally operated a legitimate hedge fund that sought to maximize returns with limited risk by pursuing an aggressive trading strategy. Defendants' strategy was flawed and Bayou began losing money almost immediately. Those losses continued throughout the life of the Bayou Funds.

4. To conceal those losses from Creditors and potential investors, Defendants misstated earnings, disseminated false accounting statements, created a phony accounting firm to "audit" fictitious annual financial statements, and routinely provided Creditors materially false and misleading information about the performance of the Bayou Funds.

5. Although the Bayou Funds were suffering substantial annual losses, Defendants continued to aggressively pursue new Creditors and new deposits. New deposits offset the losses the Bayou Funds suffered, redemptions and fictitious profits paid to withdrawing Creditors, and funds misappropriated by Defendants.

6. Eventually, Bayou collapsed under the weight of increasing trading losses, large numbers of Creditor redemptions, and exorbitant commissions paid to Defendants. In May 2005, the Attorney General of Arizona seized at least $100 million in Bayou funds in an Arizona state court proceeding. This seizure precipitated Bayou's failure and the Bayou principals announced the liquidation of the Bayou Funds in July 2005.

7. On September 1, 2005, the United States commenced civil forfeiture proceedings in this Court. *United States v. Bayou et al.*, No. 05 Civ. 7722. Defendants Israel and Marino later pleaded guilty to criminal securities fraud and conspiracy charges. *United States v. Israel*,

No. 05 CR 1036. Simultaneously, the Securities and Exchange Commission ("SEC") and the Commodity Future Trading Commission ("CFTC") initiated separate civil law enforcement actions against the Bayou Funds and their principals in this Court. *CFTC v. Bayou Management et al.*, No. 05 Civ. 8374; *SEC v. Israel et al.*, No. 05 Civ. 8376. Numerous civil actions followed and are currently pending in various state and federal courts against one or more of the Defendants. Despite a plethora of lawsuits, no Bayou Creditor has received any monies since Defendants announced they were liquidating the Bayou Funds.

## II. THE PARTIES

### A. Plaintiff On-Shore Creditors' Committee of the Bayou Family of Companies.

8. The voting members of the Committee are composed of the five largest representative members of the on-shore unsecured creditors of Bayou willing to serve. The unsecured creditors all deposited funds with Bayou for investment in the on-shore Bayou Funds. The Committee's purpose is to advocate for the common interests of creditors holding unsecured claims against one or more of the on-shore entities comprising the Bayou family of companies.

### B. Defendants

9. Defendant Bayou Group, LLC ("Bayou Group") is a limited liability company organized under the laws of Connecticut having its last known principal offices at 40 Signal Road, Stamford, CT 06902. The Bayou Group is a family of companies and individuals that created, operates, and controls the Bayou Funds.

10. Defendant Bayou Management, LLC ("Bayou Management") is a limited liability company organized under the laws of New York and having its last known principal offices at 40 Signal Road, Stamford, CT. Bayou Management served as the investment advisor to, and manager of, the Bayou Funds.

11. Defendant Bayou Securities, LLC ("Bayou Securities") is a limited liability company organized under the laws of New York having its last known principal offices located at 40 Signal Road, Stamford, CT 06902. Bayou Securities LLC is a broker-dealer registered with the SEC and is a member of the National Association of Securities Dealers ("NASD"). Bayou Securities is part of the Bayou Group and performed securities brokerage and trading services for the Bayou Funds.

12. Defendant Bayou Advisors, LLC ("Bayou Advisors") is a Delaware limited liability company with its last known mailing address at 40 Signal Road, Stamford, CT 06902. Bayou Advisors is a member of the Bayou Group.

13. Defendant Bayou Equities, LLC ("Bayou Equities") is a Delaware limited liability company with its last known mailing address at 40 Signal Road, Stamford, CT 06902. Bayou Equities is a member of the Bayou Group.

14. The Bayou Funds include the following funds:

a. Defendant Bayou Fund, LLC ("Bayou Fund"), which is a limited liability company organized under the laws of New York with its last known principal offices at 40 Signal Road, Stamford, CT 06902 and at Faust Rabbach & Oppenheim, LLP, 488 Madison Avenue, New York, NY 10022;

b. Defendant Bayou Super Fund, LLC ("Bayou Super Fund"), which is a limited liability company organized under the laws of Delaware with its last known principal offices at 40 Signal Road, Stamford, CT 06902;

c. Defendant Bayou No Leverage Fund, LLC ("Bayou No Leverage Fund"), which is a limited liability company organized under the laws of Delaware with its last known principal offices at 40 Signal Road, Stamford, CT 06902;

d. Defendant Bayou Affiliates Fund, LLC ("Bayou Affiliates Fund"), which is a limited liability company organized under the laws of Delaware with its last known principal offices at 40 Signal Road, Stamford, CT 06902; and

e. Defendant Bayou Accredited Fund, LLC ("Bayou Accredited Fund"), which is a limited liability company organized under the laws of Delaware with its last known principal offices at 40 Signal Road, Stamford, CT.

15. Defendant Samuel Israel, III ("Israel") is a founder and principal of the Bayou Group, Bayou Management, Bayou Securities, Bayou Partners, Bayou Advisors, Bayou Equities and the Bayou Funds. He was, at all relevant times, the Managing Member of Bayou Management and a registered representative with Bayou Securities. Israel is a citizen of New York and his last known address was 4 Bryan Brook Lane, Armonk, NY 10504.

16. Defendant Daniel Marino ("Marino") was, at all relevant times, the Chief Financial Officer and Chief Operating Officer of Bayou Group and Bayou Management, and was a fund manager for the Bayou Funds. Marino is also the owner and registrant for Richmond-Fairfield Associates. Defendant Marino is a citizen of Connecticut and his last known address was at 128 Daskams Lane #2B, Norwalk, CT 06851.

**C. Off-Shore Investors**

17. In October and November 2003, Israel and Marino created seven Cayman Islands exempted limited companies related to the Bayou Funds: the Bayou Off-Shore Master Fund and Bayou Off-Shore Funds A, B, C, D, E, and F (the "Off-Shore Bayou Funds"). It appears that Bayou Off-Shore Funds A, B, C, D, E, and F were to serve as feeder funds for the Bayou Off-Shore Master Fund, which in turn sent funds to defendant Bayou Management. The Bayou Off-Shore Funds are separate and distinct entities from the Bayou Funds that are the subject matter of

this Complaint. In August 2005, the managing shareholders of the Off-Shore Bayou Funds commenced liquidation proceedings in the Grand Court of the Cayman Islands. The Grand Court appointed Gordon I. Macrae and G. James Cleaver of Kroll (Cayman) Ltd. as joint liquidators (the "Kroll Liquidators").

## III. JURISDICTION AND VENUE

18. Claim I arises under the provisions of the Securities Exchange Act of 1934, 15 U.S.C. §78a *et seq*. (the "1934 Act."). Subject matter jurisdiction of this Claim arises under 15 U.S.C. §78aa and 28 U.S.C. § 1331. The remaining claims arise under state law, and this Court has subject-matter jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

19. Venue in this Court is proper pursuant to 15 U.S.C. §78aa and 28 U.S.C. § 1391 because acts or transactions constituting violations of provisions of Section 10(b) of the 1934 Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, occurred in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

20. As venue lies in this district under 15 U.S.C. §78aa, Defendants are subject to personal jurisdiction in this Court wherever they may be found pursuant to the same statute. This Court also has personal jurisdiction over all Defendants who reside in the State of New York, who have engaged in business activities in New York, and who have engaged in tortious conduct within New York such that this Court's exercise of its jurisdiction over the Defendants does not offend traditional notions of fair play and substantial justice.

## IV. FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

### A. Creation of the Bayou Funds.

21. In June 1996, Israel and Marino founded the Bayou Group and opened their first hedge fund, the Bayou Fund. The Bayou Fund began taking investors in January 1997. Israel

subsequently added Bayou Securities and Bayou Management to the Bayou Group in 1997 and Bayou Advisors and Bayou Equities to the Bayou Group in 2001.

22. In January 2003, Bayou Management liquidated the Bayou Fund and created four separate funds—Bayou Accredited, Bayou Affiliates, Bayou No Leverage and Bayou Superfund—all registered as Delaware limited liability companies.

23. Bayou represented to investors that the goal of the funds was to provide steady, above-average market returns with a lower risk profile than is normally associated with similar trading strategies. From January 1996 to July 2005, the Bayou Funds took in an estimated $450 million in deposits from investors.

24. The Bayou Funds' assets were traded through accounts maintained by Bayou Securities, which in turn cleared trades through a registered-broker. Bayou Management maintained primary bank accounts on behalf of the Bayou Funds at Citibank and then at Wachovia Bank.

**B. The Bayou Operating Agreements.**

25. Following the 2003 liquidation of the Bayou Fund, each of the successor Bayou Funds was organized as a Delaware limited liability company. As such, each fund was governed by an Operating Agreement. The relevant provisions of the various Operating Agreements were substantively identical.

26. The Operating Agreements permitted the Bayou Hedge Fund Managers to, among other things, purchase, invest, trade, and sell in capital stock, subscriptions, warrants, bonds, notes, debentures, convertible, rights, options, puts and calls, and other securities (both equity and debt) of companies, including financial instruments, indices and derivatives (collectively referred to as "Securities"). The Operating Agreements also granted the Bayou Hedge Fund

Managers complete authority, power, and discretion to make all decisions regarding such matters, and to perform any and all other acts or activities customary or incident to the management of the business of the funds. Israel and Marino, through Bayou Management, were the Managers of the Bayou Funds.

27. The Operating Agreement also outlined the Managers' duties and obligations relating to the Bayou Funds. The Managers had a duty and an obligation to perform their managerial duties in good faith, in a manner they reasonably believed to be in the best interests of the Bayou Funds, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. According to the Operating Agreements, Managers are liable to Creditors for any loss or damage resulting from fraud, deceit, gross negligence, willful misconduct, or a wrongful taking of funds.

**C. The Bayou Fraud.**

28. The Bayou trading strategy proved unsuccessful and within the first several months of operation, the Bayou Fund sustained trading losses. Defendants began concealing volatile swings of trading gains and losses by fabricating results and providing Creditors with false performance summaries. In 1997, Defendants' actual performance failed to meet projections. Defendants, however, hid the Bayou Fund's poor performance from Creditors and potential investors by transferring a portion of trading commissions paid to Bayou Securities back into the fund. As a result, at year-end Creditors and potential investors were under the false impression that Bayou had been profitable.

29. Throughout 1998, the Bayou Fund sustained millions of dollars of net losses. Defendants concealed these losses by making material misstatements to Creditors. Israel and Marino created false investment reports for Creditors and then used the inaccurate results

contained in those reports to create false annual financial statements.

30. Because Bayou's mounting losses could not withstand the scrutiny of an independent audit, Defendants dismissed their accounting firm in late 1998 and created a fictitious one—Richmond-Fairfield Associates—to pose as an independent auditor. Bayou was the sole client and Defendant Marino was the sole principal of Richmond-Fairfield Associates. The fictitious accounting firm prepared phony "independent" audit reports that verified Bayou's false financial statements and performance summaries.

31. The Bayou Funds continued to lose money in 1999 through 2005. During each of these years, Defendants concealed those losses by creating and distributing false performance summaries and false financial statements ostensibly "audited" by Richmond-Fairfield Associates. With the assistance of Richland-Fairfield Associates, Bayou made a series of false statements regarding the performance of the Bayou Funds, including:

a. From 2001 through 2005, Bayou distributed annual financial statements and reports to Creditors that contained false financial information and incorporated falsified auditors' reports. For example, both the 2003 and 2004 annual statements overstated the Bayou Funds' total assets, net income, and gains from investment transactions.

b. Bayou also frequently distributed quarterly reports to clients, containing materially misleading information including non-existent rates of return.

c. From 2001 through May 2005, Bayou provided Creditors monthly account statements showing opening and closing capital, profits, and losses for each month. These statements failed to disclose that the Bayou Funds were actually losing money during this time period.

32. Even though Bayou was concealing substantial losses from 1996 to 2002,

Defendants continued to solicit new and current Creditors for additional funds, raising tens of millions of dollars in the process. To attract more capital, Defendants liquidated the Bayou Fund and formed the Bayou Accredited, Bayou Superfund, Bayou No Leverage, and Bayou Affiliates funds in January 2003. According to the SEC, investor deposits subsequently peaked at more than $125 million. The reorganization did not improve profitability and the four new funds continued to lose substantial sums of money, which Defendants continued to conceal.

33. The Bayou strategy involved large numbers of high dollar value trades, and Bayou Securities, which is wholly-owned by Israel, executed the vast majority of those trades. In the process, Bayou Securities earned substantial commissions that were then distributed to Israel and Marino as salary and profits. As a result of the high commission payments, many profitable trades resulted in net losses for the Bayou Funds. The SEC has alleged that in 2003 the Bayou Funds lost an estimated $49 million while Bayou Securities earned an estimated $29 million in commissions.

34. In addition to the commissions paid to Bayou Securities, Bayou Management also withdrew "incentive fees" calculated as a percentage of the Bayou Funds' fictitious profits despite the fact that the Operating Agreement granted such fees only when the Bayou Funds were profitable in a given year. The Bayou Funds never earned an actual profit in any year.

**D. The Unraveling of Bayou.**

35. Eventually, the trading losses sustained by the Bayou Funds, the high commissions paid to Bayou Securities, redemptions by Creditors, and the incentive fees and profits extracted from Bayou by Israel and Marino outpaced Bayou's ability to attract new investors. To mask this development and to continue to disguise their losses, Defendants began to search for short-term, high-yield investments.

36. In April 2004, Defendants, without informing Creditors, stopped virtually all trading and liquidated the Bayou Funds. Israel then invested a substantial amount of Bayou assets—approximately $180 million—in a series of high risk prime bank instrument trading programs in Europe. Over the next 12 months, Israel and Marino undertook a number of bank transfers that eventually ended with the deposit of approximately $100 million of Bayou funds in a Wachovia Bank branch in Flemington, New Jersey. After being alerted by bank officials in May 2005, the Arizona Attorney General investigated the source of the $100 million and then commenced a forfeiture action in Arizona state court alleging that the funds were the proceeds of a fraudulent prime bank instrument scheme. The Arizona state court ordered seizure of these funds.

37. In July 2005, Defendants informed Creditors by letter that the Bayou Funds were closing and that Creditors would receive 100 percent of their deposits. A second letter indicated that partial distributions would begin by mid-August 2005.

38. In mid-August 2005, Defendants sent Creditors a letter indicating that 90 percent of their funds would be distributed the following week, with the remainder to be distributed by the end of August. Some Creditors did receive checks from Bayou, but when Creditors attempted to cash them, those checks were returned for insufficient funds.

39. Following widespread media reports regarding the collapse of the Bayou Funds, the United States, acting through the United States Attorney for this District, filed its civil forfeiture action against the Bayou Group and later initiated criminal actions against Israel and Marino. These criminal actions sought, among other forms of relief, forfeiture of Israel and Marino's personal assets and the approximately $100 million of Bayou assets the Arizona Attorney General had seized. The SEC and the CFTC followed with their civil law enforcement

actions discussed above.

40. On September 9, 2005, the Kroll Liquidators filed ancillary petitions under § 304 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut in aid of their pending liquidation proceedings in the Cayman Islands. The bankruptcy court subsequently on October 10, 2005 granted the Kroll Liquidators' request for ancillary relief and entered a preliminary injunction precluding the commencement or continuation of any judicial or regulatory proceeding involving the Off-Shore Bayou Funds, or actions against any property in the United States in which the Kroll Liquidators have an interest. This injunction, however, does not apply to any action with respect to the commencement of any claim against the On-Shore Bayou Funds or a claim against their assets located within the United States that are the subject matter of this Complaint.

## V. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

**Against All Defendants for Violations of Section 10(b) of the 1934 Act and Rule 10b-5**

41. Plaintiff realleges and reincorporates paragraphs 1 through 40 as if fully set forth in this Complaint.

42. The contractual rights granted to Creditors who invested in the Bayou Funds are securities within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. §78c(a)(10).

43. Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devises, schemes, or artifices to defraud; (b) made untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit.

44. As set forth above, Defendants knowingly or recklessly employed devises, schemes, or artifices to defraud, made numerous false and misleading statements of material fact regarding the performance and value of the Bayou Funds to investors and prospective investors including the Plaintiff's members, and engaged in acts, practices or courses of business which operated as a fraud or deceit on investors.

45. Defendants misrepresented and failed to disclose to Creditors material facts concerning, among other things, the value of the Bayou Funds' holdings, the corresponding net asset value of the Bayou Funds, and the values of the Creditors' interests in the Bayou Funds. These misrepresentations and omissions were repeatedly made to Creditors and potential

investors in numerous communications including, but not limited to, quarterly and monthly reports, weekly newsletters, annual financial statements, and phony "independent" financial audit reports.

46. Defendants employed, as part of their scheme to defraud, a fictitious accounting firm that they knowingly or recklessly misrepresented to be independent.

47. Defendants employed, as part of their fraudulent scheme, a classic Ponzi-scheme in which they used new money that they had fraudulently induced new investors to deposit in the Bayou Funds to pay principal and fictitious profits to redeeming investors.

48. Defendants knew, or were reckless in not knowing, that their conduct was a fraud on Creditors and that the fraud would result in, and did result in, the purchase and sale of securities at inflated prices.

49. At all times, Defendants possessed accurate information regarding the Fund's actual net asset value and performance. Defendants knowingly or recklessly disregarded this information in reporting false valuations.

50. Defendants made the material misrepresentations and omitted material facts with the intent to induce Creditors to purchase and sell securities. Creditors reasonably and justifiably relied on the misrepresentations and omissions in purchasing and selling the securities.

51. By reason of their actions, Defendants violated section 10(b) of the 1934 Act (15 U.S.C. § 78j) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

52. As a direct and proximate result of the Defendant's fraudulent acts, the Committee's members suffered significant losses. By reason of their actions, the Committee invokes the equitable powers of this Court to seek temporary and permanent equitable relief from the Defendants for the benefit of the Creditors, including, but not limited to (a) the appointment

of an equity receiver to manage and control the Bayou Group; (b) a complete accounting of all money deposited by Creditors with the Funds and disbursed by the Funds to any person, including an accounting of all money received or disbursed by any of the Defendants in connection with their fraudulent schemes; and (c) such other equitable relief as the Court believes is just and adequate to remedy the injuries to Creditors.

**SECOND CLAIM FOR RELIEF**

**Against All Defendants for Fraud**

53. Plaintiff realleges and reincorporates paragraphs 1 through 52 as if fully set forth in this Complaint.

54. As set forth above, Defendants committed fraud by knowingly making misrepresentations and omissions of material fact with intent to deceive on which Creditors relied.

55. Defendants misrepresented and failed to disclose to Creditors material facts concerning, among other things, the value of the Bayou Funds' holdings, the corresponding net asset value of the Bayou Funds, and the values of the Creditors' interests in the Bayou Funds. These misrepresentations and omissions were repeatedly made to Creditors and potential investors in numerous communications including, but not limited to, quarterly and monthly reports, weekly newsletters, annual financial statements, and phony "independent" financial audit reports.

56. Defendants knew, or were reckless in not knowing, that their conduct was a fraud on Creditors and that the fraud would result in, and did result in, the purchase and selling of securities at inflated prices, and the retention of securities after they otherwise would have been sold.

57. Defendants made the material misrepresentations and omitted to disclose material facts with the intent to induce Creditors to purchase, sell, or retain securities. Creditors reasonably and justifiably relied on the misrepresentations and omissions in purchasing, selling and retaining the securities.

58. Defendants' fraudulent conduct was done purposefully, maliciously, and without regard for the rights and interest of the Creditors.

59. As a direct and proximate result of the Defendants' fraudulent acts, the Committee's members suffered significant losses. The Committee therefore invokes the equitable powers of this Court to seek temporary and permanent equitable relief for the benefit of the Creditors, including, but not limited to (a) the appointment of an equity receiver to manage and control the Bayou Group; (b) a complete accounting of all money deposited by Creditors with the Bayou Funds and disbursed by the Bayou Funds to any person, including an accounting of all money received or disbursed by any of the Defendants in connection with their fraudulent schemes; and (c) such other equitable relief as the Court believes is just and adequate to remedy the injuries to Creditors.

## THIRD CLAIM FOR RELIEF

### Against All Defendants for Breach of Fiduciary Duty

60. Plaintiff realleges and reincorporates paragraphs 1 through 59 as if fully set forth in this Complaint.

61. Defendants were fiduciaries of the Creditors because they (1) solicited, received, managed, and controlled the contributions that Creditors made to the Bayou Funds; (2) held themselves out as financial advisors and professional experts in hedge fund investment; and (3) had superior knowledge of hedge funds in general and the Bayou Funds in particular.

62. Creditors reasonably and justifiably placed trust and confidence in the integrity, fidelity, and professionalism of Defendants in connection with the management of the Bayou Funds and the provision of financial and investment advice.

63. As fiduciaries, Defendants owed Creditors the duties of loyalty, due care, and fair dealing. Defendants were obligated to act in the best interest of the Creditors, provide Creditors with accurate and materially complete information, and refrain from placing their own interests ahead of those of the Creditors.

64. Defendants violated their fiduciary duties by, among other things, (1) making numerous material misrepresentations and omissions of fact concerning the performance and net asset value of the Bayou Funds, (2) failing to safeguard the Creditors' assets, (3) providing the Creditors with false and misleading documents, and (4) placing their own interests ahead of the Creditors.

65. As a direct and proximate result of the Defendants' breach of fiduciary duties, the Committee's members suffered significant losses. The Committee therefore invokes the equitable powers of this Court to seek temporary and permanent equitable relief for the benefit of the Creditors, including, but not limited to (a) the appointment of an equity receiver to manage and control the Bayou Group; (b) a complete accounting of all money deposited by Creditors with the Bayou Funds and disbursed by the Bayou Funds to any person, including an accounting of all money received or disbursed by any of the Defendants in connection with their fraudulent schemes; and (c) such other equitable relief as the Court believes is just and adequate to remedy the injuries to Creditors.

## VI. PRAYER FOR RELIEF

Plaintiff Committee prays this Court take the following actions:

A. Appoint a Receiver empowered to take various actions, including: i) marshal any and all assets belonging to the Bayou Group; ii) investigate the books and records of the Bayou Group; ii) prosecute any and all claims belonging to the Bayou Group; iii) develop an orderly plan of liquidation, and iv) develop a fair and equitable plan of distribution of Bayou's assets to those creditors with a legitimate claim to the funds;

B. Awarding other equitable relief, including: i) an Order requiring Defendants Israel and Marino, to produce an accounting; and ii) a preliminary and permanent injunction precluding all Defendants and others from taking any action that interferes with the actions of this Court's appointed receiver;

C. Awarding Plaintiff all costs, disbursements, and expenses incurred in prosecution of this action, including attorneys' fees; and

D. Awarding Plaintiff such other relief as the Court shall deem just and proper.

DATED this 27th day of March, 2006.

Joseph A. Gershman (JG-8275)
KASOWITZ BENSON TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Tel: (212) 506-1770
Fax: (212) 506-1800
Attorneys for Plaintiff

Richard A. Kirby
Philip M. Guess
Scott Lindsay
Joshua C. Gaul
PRESTON GATES ELLIS
& ROUVELAS MEEDS LLP
1735 New York Avenue, N.W., Suite 500
Washington, D.C. 20006-5209
Tel: (202) 661-3730
Fax: (202) 331-1024
Counsel for Plaintiff